ILLINOIS CENTRAL RAILROAD CO., a corporation, Plaintiff-Appellee,

v.

BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al., Defendants-Appellants.

No. 14486.

United States Court of Appeals Seventh Circuit.

June 22, 1964.

Burke Williamson, Chicago, Ill., Adams, Williamson & Turney, Chicago, Ill., for Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, and Order of Railway Conductors and Brakemen.

Harold C. Heiss, Russell B. Day, Cleveland, Ohio, for Brotherhood of Locomotive Firemen and Enginemen.

Harold N. McLaughlin, Cleveland, Ohio, for Brotherhood of Locomotive Engineers.

V. C. Shuttleworth, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for Order of Railway Conductors and Brakemen.

John W. Foster, Robert S. Kirby, William F. Bunn, Wence F. Cerne, Chicago, Ill., for Illinois Central Railroad Co., plaintiff-appellee. Joseph H. Wright, Chicago, Ill., of counsel.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

The plaintiff-appellee, Illinois Central Railroad Company, instituted this action in the District Court against defendants-appellants,[1] the Brotherhood of Locomotive Firemen and Enginemen, the Brotherhood of Locomotive Engineers, the Order of Railway Conductors and Brakemen, and individuals in the employ of plaintiff who are members of or are represented by said organizations, seeking injunctive relief to prevent a threatened strike against the plaintiff railroad scheduled to commence on July 25, 1963. The court issued a temporary restraining order, and following a combined hearing on the issuance of a preliminary injunction and upon the merits, made and entered findings of fact and conclusions of law upon which it based a judgment order or decree permanently enjoining the defendants from striking in connection with the labor dispute involved.

The record discloses that the dispute which culminated in the threatened strike action concerned a request by the unions that the railroad furnish transportation into the East St. Louis, Illinois, business district for away-from-home freight crews required to lay-over at a newly designated tie-up point some three miles distant from the previous tie-up point located near Sixth Street in East St. Louis. Bus transportation was available within about a block from the Sixth Street tie-up point. It was about a mile away from the new tie-up point and the intervening area was a deteriorating residential district. Some 75 employees reported for work and were relieved of duty at the East St. Louis Terminal tie-up point. An average of 17 men per day

---

1. The Brotherhood of Railroad Trainmen and plaintiff's employees represented by it are also defendants but did not join in the appeal.

who do not have the terminal as their home base are required to lay-over at the tie-up point before returning to their home terminal. These away-from-home crewmen had utilized bus transportation, at their own expense, to avail themselves of eating, sleeping, and recreational facilities in East St. Louis.

The existing collective bargaining agreements between the unions and the railroad contained no provision concerning or limiting the right of the railroad to make changes in the location of tie-up points or concerning facilities to be furnished by the railroad at such points.

On March 1, 1962, the local chairmen of the defendant unions were called in by the division superintendent of the railroad and advised of the contemplated change in the tie-up point. The change was being made as a part of an improvement and modernization program involving the revamping and rehabilitation of the freight terminal facilities at the "Hump Yard", where the railroad's primary yard operations at the terminal had been carried on. The Hump Yard was to be the new tie-up point. On December 7, 1962, the local chairmen wrote a letter to the division superintendent, Mr. H. R. Koonce, stating that the employees involved requested that before the change was made effective five specifically designated facilities be made available at the Hump Yard tie-up point. This request called for the railroad to provide eating, sleeping, bath and toilet, locker room, and lounge room facilities; and regular inspection and maintenance thereof. Koonce replied, on January 4, 1963, that the matter would be looked into, and on May 23, 1963, advised that adequate facilities were being constructed at the yard and "it is expected that they will be completed prior to the moving date sometime in early July". On May 24, 1963, the local chairmen first made known that they "believe[d] the men should have access to transportation from the

yard to downtown East St. Louis" pointing out that at the railroad's Freeport, Illinois, terminal transportation from the yard to the city was furnished at the expense of the railroad. At this point the unions' general chairmen entered the picture and on May 29, 1963, addressed a communication to the railroad's manager of personnel, Mr. Walter J. Cassin, stating that "what facilities or what provisions are being made" involved "working conditions, and must be settled before any change is made in the tie-up point". An early conference to discuss the subject was requested. Conferences followed between the general chairmen and the railroad on June 19, July 18, 23 and 24, 1963. The parties were in substantial agreement concerning the physical facilities to be furnished and the physical facilities requested were furnished. The facilities at the Hump Yard tie-up point were put into service July 24, 1963. No agreement was reached concerning the furnishing of transportation at railroad expense and the general chairmen resolved to institute a strike commencing on July 25, 1963.

The District Court found, among other things, that there are no collective bargaining agreements between the parties which require the railroad to furnish any of the facilities or services requested by the defendants; that no Section 6[2] notice was served in connection with the dispute; that representatives of the railroad met with representatives of the defendants on numerous occasions and in a good faith effort attempted to resolve the dispute, and the railroad acceded to most of the requests made upon it except the one for payment of mileage between the new tie-up point and the East St. Louis business district; and that the dispute has been submitted by the railroad to, and is pending before, the National Railroad Adjustment Board for adjudication.[3] The court concluded that the dispute is a "minor" dispute and that

2. Section 6 of the Railway Labor Act (45 U.S.C.A. § 156).

3. The National Mediation Board refused to take jurisdiction on the grounds that

the dispute "is one primarily involving interpretation or application of existing agreements" and that "no Section 6 notices have been served".

a strike or work stoppage would be unlawful and would cause irreparable harm, not only to the plaintiff but also to the public; and that an injunction as prayed for should issue.

On the record before us we perceive no error in the District Court's findings or conclusions. The defendants concede that the right of the railroad to change the tie-up point is not forbidden or restricted by the terms of any existing agreement between the railroad and the defendants. And they conceded, before the District Court, that no Section 6 notice was served concerning the matter in dispute.

Under the circumstances here involved the change in the tie-up point did affect "working conditions" but it involved a matter of working conditions omitted from the contracts and in the absence of a Section 6 notice as a foundation for negotiations to add a provision or provisions to the existing collective bargaining agreements concerning the facilities to be furnished at, or transportation to be furnished from, tie-up points, the dispute over the matter remained a minor dispute. Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 722–724, 65 S.Ct. 1282, 1289–1290, 89 L.Ed. 1886, points out, with respect to the Railway Labor Act, that:

"The statute first marks the distinction in Section 2, which states as among the Act's five general purposes: '(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.' The two sorts of dispute are sharply distinguished, though there are points of common treatment. Nevertheless, it is clear from the Act itself, from the history of railway labor disputes and from the legislative history of the various statutes which have dealt with them, that Congress has drawn major lines of difference between the two classes of controversy.

"The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise *where there is no such agreement or where it is sought to change the terms of one,* and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, *a situation in which no effort is made to bring about a formal change in terms* or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation *or to an omitted case.* In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

"In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.

"The so-called minor disputes, on the other hand involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or *arise incidentally in the*

*course of an employment. They represent specific maladjustments of a detailed or individual quality.* They seldom produce strikes, though in exaggerated instances they may do so. Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic, the 1934 Act sets them apart from the major disputes and provides for very different treatment." (Emphasis supplied.)

And, as this Court pointed out in Hilbert v. Pennsylvania R. R. Co.,·7 Cir., 290 F.2d 881, 883:

" 'Major disputes' encompass those differences arising out of proposals for new contracts or of changes in existing contractual or legal obligations and relations. They arise where there is no collective bargaining agreement or where it is sought to change the terms of one. In such a case, the issue cannot be resolved by reference to an existing agreement.

" 'Minor disputes', on the other hand, are grievances or other differences arising out of the application or interpretation of an existing collective bargaining agreement. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation. See Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 722, 65 S.Ct. 1282, 89 L.Ed. 1886.

"The Act marks out two distinct routes for settlement of the two classes of disputes. As to both, the Act requires the parties enter into negotiations as the first step towards settlement of the controversy (§ 2, Second, 45 U.S.C.A. § 152, Second). Beyond this initial stage the procedures diverge. Major disputes go first to mediation (§ 5, First, 45 U.S.C.A. § 155, First); if that fails, to acceptance or rejection of arbitration (§ 5, First, 45 U.S.C.A. § 155, First); and finally to possible presidential intervention (§ 10, 45 U.S.

C.A. § 160). If all this fails, compulsory processes are at an end, and either party may resort to self help. No authority is empowered to decide the dispute unless the parties agree to arbitration.

"In minor disputes, if negotiation fails, either party may submit the controversy to the National Railroad Adjustment Board (§ 3, First (i), 45 U.S.C.A. § 153, First (i)). The awards of the Board are final and binding on the parties (§ 3, First (m), 45 U.S.C.A. § 153, First (m)). This is a form of compulsory arbitration.

"Generally, the Norris-LaGuardia Act prohibits the issuance of an injunction in cases involving any 'labor dispute' (29 U.S.C.A. § 104). In Order of Railroad Telegraphers v. Chicago & N. W. Ry. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774, the Court held the Norris-LaGuardia Act prevented the issuance of an injunction to enjoin a strike in a railway labor case involving a major dispute. However, in Brotherhood of Railroad Trainmen v. Chicago River & Ind. R. R. Co., 353 U.S. 30, 77 S. Ct. 635, 1 L.Ed.2d 622, a case involving a minor dispute, the Court stated that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. The Court said, 353 U.S. at page 40, 77 S.Ct. at page 640: 'There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved.' "

In this Court the defendants suggest that the local chairmens' letters of December 7, 1962 and May 24, 1963, to the division superintendent constitute substantial compliance with the notice requirements of Section 6, and in all events, any technical defects therein were overcome by the general chairmens' letter of May 29, 1963 to the railroad's manager of personnel. Not only is this contrary to the concession defendants made in the trial court (Cf. Norfolk & P. B. L. R.

Co. v. Brotherhood of Railroad Trainmen, 4 Cir., 248 F.2d 34, 45–46) but from our examination of the letters relied upon we find no merit in the contention the defendants now make.

Although the first two letters suggested "proper negotiations" and "further consideration" concerning the facilities to be furnished and the May 29th letter requested an "early conference date" to discuss the subject none of the letters made any express reference to Section 6 or suggest any intention to propose a change in or addition to the existing contracts.

We conclude that the District Court did not err in its determination that the dispute was a "minor dispute" and that under the circumstances presented the railroad was entitled to the injunctive relief awarded. The judgment order of the District Court is affirmed.

Affirmed.