411 F.Supp. 954 (1976)
The AIRLINE FLIGHT ATTENDANTS IN the SERVICE OF TEXAS INTERNATIONAL AIRLINES, INC., as represented by the Air Line Pilots Association, International, Plaintiff,
v.
TEXAS INTERNATIONAL AIRLINES, INC., Defendant.
Civ. A. No. 75-H-1459.
United States District Court, S. D. Texas, Houston Division.
March 17, 1976.
*955 *956 Mullinax, Wells, Mauzy & Baab, Inc. (Hal K. Gillespie, Atty. in Charge), Dallas, Tex., for plaintiff.
Benjamin Best, II, Houston, Tex., for defendant.

MEMORANDUM OPINION AND ORDER
NOEL, District Judge.
This suit is brought by the Airline Flight Attendants in the service of Texas International Airlines, Inc., as represented by the Air Line Pilots Association, International (hereinafter referred to as the "Flight Attendants") who seek to enjoin alleged violations of the Railway Labor Act, 45 U.S.C. § 151, et seq., by defendant Texas International Airlines, Inc. (hereinafter referred to as the "Airline"). Jurisdiction of this suit is vested in the Court by virtue of 28 U.S.C. § 1337. Having agreed that there are no material facts in dispute, the parties submitted the case to the Court for disposition as a matter of law on plaintiff's prayer for injunctive relief and defendant's Motion to Dismiss, or in the alternative, for Summary Judgment.
The controlling issue in this case is whether the unilateral action of the Airline in cancelling and rerouting certain flights during the months of July and October gave rise to a "major" or a "minor" dispute. These two classes of disputes are distinguished in Section 2 of the Railway Labor Act (hereinafter referred to as the R.L.A.), 45 U.S.C. § 151a, which states as among the five general purposes of the Act:
(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.
The former class of disputes has been labeled "major", while the latter class has been labeled "minor". The distinction between these two classes of disputes is important because the R.L.A. sets forth two entirely different procedures for the settlement of the two types of disputes. The most important procedural difference for purposes of this case is that in a major dispute the R.L.A., 45 U.S.C. § 156, imposes upon the parties a legally enforceable obligation to refrain from altering the status quo while the Act's "almost interminable process" is being exhausted (see e. g., Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325, 332 (1969)), whereas in a minor dispute the Act is silent as to any obligation to maintain the status quo. Accordingly, it has generally been held that a carrier cannot be required to maintain the status quo pending resolution of minor disputes. See Ruby v. TACA International Airlines, S.A., 439 F.2d 1359 (5th Cir. 1971).
The only two exceptions to this general rule are that an injunction may issue against a carrier when necessary to preserve the jurisdiction of a board of adjustment over a minor dispute already submitted to it and an injunction restraining a union from striking a carrier during a minor dispute may be conditioned *957 upon the carrier maintaining the status quo. Neither of these two exceptions is applicable here since this dispute has not been submitted to the System Board of Adjustment and the Airline has not sought to enjoin any strikes. Thus, the Flight Attendants' request for injunctive relief, insofar as it seeks to require the Airline to restore and maintain the status quo that existed prior to the cancellation and rerouting of certain flights, can be granted only if the dispute is major.
The Flight Attendants have also requested injunctive relief requiring the Airline to comply with the mandate of 45 U.S.C. § 152, First, which states in pertinent part:
It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise . . ..
Since it is clear that the Airline has been willing and has in fact attempted to settle this dispute with the Flight Attendants, but has merely refused to treat such discussions as negotiations pursuant to a Section Six (45 U.S.C. § 156) major dispute notice,[1] the Airline can be held to be in violation of 45 U.S.C. § 152, First, only if the dispute is in fact a major dispute.
Briefly summarized, the material facts of this case as they appear from the affidavits submitted by the parties follow. The defendant, Texas International Airlines, is a regional, C.A.B., certificated, air carrier. In the course of its daily operation, the Airline makes an average of 277 departures from the 48 communities it serves, utilizing a fleet of 20 DC9 jet aircraft and 13 CV-600 turbo-prop aircraft. As of November 1, 1975, the Airline employed 246 captains and co-pilots and 196 flight attendants to serve in the operation of its fleet of aircraft over its routes. The Airline maintains separate collective bargaining agreements with its pilots and its flight attendants, both of whom are represented by the Air Line Pilots Association.
In March of 1975 the Airline and the Flight Attendants exchanged Section Six notices proposing changes in the collective bargaining agreement then in effect between the Airline and the Flight Attendants pursuant to Section 34 of said agreement which provided that:
This Agreement . . . shall continue in full force and effect until June 1, 1975, and shall renew itself without change until each succeeding June 1, thereafter, unless written notice of intended change is served in accordance with Section 6, Title 1, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to June 1, in any year after 1974.
Negotiations on these proposed changes commenced on May 19, 1975 and continued on a regular basis until a tentative agreement was reached on August 8, 1975.
Meanwhile, on July 7 and 8 of 1975, the Airline began unilaterally cancelling and deleting certain flights, and rerouting others. Since the Flight Attendants "bid" on schedules on a monthly basis, these mid-month schedule changes caused some flight attendants who had sufficient seniority to bid a desired schedule to lose a portion of such schedule for the remainder of the month. It also caused 17 flight attendants to lose in the aggregate the sum of $1,152.70 in pay due to flight time lost because of the schedule changes.[2] With full knowledge that the Airline claimed the right to make these mid-month schedule changes under the collective bargaining agreement then in effect,[3] the Flight Attendants' *958 bargaining representative signed a tentative, new agreement on August 5, 1975 without making any attempt to change the agreement to deal with the problem of mid-month schedule changes.[4]
On August 20, 1975, while the tentative agreement signed by the bargaining representatives for the Airline and the Flight Attendants was awaiting ratification by the Flight Attendants' membership, the Flight Attendants served a Section Six notice on the Airline that proposed to change the collective bargaining agreement to prohibit mid-month schedule changes except under certain conditions. On August 21, 1975 this suit was filed and a hearing was held on plaintiff's application for a temporary restraining order on August 25. At said hearing the Airline reiterated its position that its action in making mid-month schedule changes was covered and permitted by the collective bargaining agreement and that any dispute concerning such schedule changes was at most a matter of contract interpretation within the exclusive jurisdiction of the System Board of Adjustment.
On September 5, 1975, representatives of the Flight Attendants and the Airline met to attempt to resolve their differences over mid-month schedule changes. The Airline made clear that, as far as it was concerned, the September 5 meeting was not being held pursuant to the Section Six notice theretofore filed by the Flight Attendants on August 20 because the tentative agreement approved by the representatives of each party on August 8 precluded negotiations over additional changes while a vote by the Flight Attendants' membership on the tentative agreement was pending. On September 19, the tentative agreement was ratified by vote of the membership of the Flight Attendants and a new collective bargaining agreement was signed pursuant to that ratification.
On October 26, 1975, the Airline again unilaterally put into effect a mid-month schedule change.[5] As a result of this mid-October schedule change, a total of seven flight attendants lost in the aggregate the sum of $565.40 due to lost flight time.[6] This action by the Airline caused the Flight Attendants to file a second application for a temporary restraining order, which was denied, the Court, however, agreeing to expedite the disposition of this case on its merits.
In determining whether the above facts give rise to a major or minor dispute, the Court must apply the classic definition of major and minor disputes set forth by the Supreme Court in Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, 1894 (1945):
The first [major disputes] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
The second class [minor disputes], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement . . .. In either case the claim is to rights *959 accrued, not merely to have new ones created for the future.
In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world.
From this definition two types of minor disputes can be distinguished. The first type of minor dispute relates to the meaning or proper application of a particular provision of an existing collective agreement with reference to a specific situation. The second type of minor dispute involves differences arising incidentally in the course of employment. Not being covered by any express provision of the collective agreement, differences of this type are called "omitted cases". The Court need only decide if the dispute in this case arguably falls into either one of the two categories of minor disputes set forth above; i. e., is the dispute either arguably covered by express provisions of the collective agreement or an omitted case arguably within the scope of the residual managerial prerogative left with the Airline by the agreement? See United Industrial Workers v. Board of Trustees of Galveston Wharves, 351 F.2d 183, 188 (5th Cir. 1965); IAM v. Eastern Air Lines, Inc., 8 Av.Cas. 17,947, 17,948 (S.D.Fla.1963), aff'd 320 F.2d 451 (5th Cir. 1963). In other words, if the contractual defense raised by the Airline as justification for its actions is not frivolous, but is made in good faith, then the dispute is minor and it is within the exclusive jurisdiction of the System Board of Adjustment to interpret the contract and determine which party is right. United Transportation Union General Committee of Adjustment v. Baker, 499 F.2d 727 (7th Cir. 1974), cert. den., 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974).
The Airline has argued that the dispute over mid-month schedule changes is covered by several of the express provisions of the contract. First, it is pointed out that Section 3(F) of the contract specifically addresses the problem of flight cancellations.[7] Section 3(F) provides for the compensation of a flight attendant for a trip cancelled during the last four days of a month, if the flight attendant is unable to make up the lost flight time during the remainder of that month. It could be argued that Section 3(F) necessarily implies that the Airline has the right to unilaterally cancel flights during the middle of a month and that provision was made for compensation for cancelled flights only if the cancellations occurred during the last four days of the month, because it was thought that the flight attendants would be able to make up time lost during any other part of the month before the end of the month.
The Flight Attendants argue that the language concerning flight cancellations only contemplates the cancellation of single flights, and not a schedule change that cancels a particular flight for the remainder of a month. That question, however, is clearly a matter of contract interpretation and is not for this Court to decide. It is sufficient for purposes of this case to note that the right to unilaterally *960 cancel flights during the middle of the month arguably encompasses the right to make schedule changes during the middle of the month.
The Airline also relies on Part (G) of Section 2 of the agreement which provides:
"Regular Bid" means a full month's flight attendant flying, requiring the equivalent of the flying of one flight attendant for one full month and shall include scheduled flying posted for bid prior to the beginning of each month. Flying requiring a flight attendant for less than seventy (70) hours shall not be deemed to be a regular bid. (Emphasis added)
It is argued that if a regular bid "shall include scheduled flying posted for bid . . .," then clearly some flying done by regular flight attendants which was not included and posted for bid prior to the beginning of the month was also contemplated.
In addition, Section 16 of the agreement labelled "SCHEDULES" provides in part (D) that:
The Company shall maintain a method of contacting flight attendants to notify them of any change in normal schedules. Flight attendants must provide the Scheduling Department with their current telephone numbers. (Emphasis added)
The Airline argues that this provision demonstrates that some change in "normal schedules" was anticipated by the parties.
It should be noted that unlike the cases where the impact of the carrier's action on the rates of pay or working conditions of its employees was so adverse as to preclude a reasonable argument that the action was contemplated by the collective agreement (See United Industrial Workers v. Board of Trustees of the Galveston Wharves, 351 F.2d 183 (5th Cir. 1965)), the effect of the Airline's action in making mid-month schedule changes in the instant case could almost be described as de minimus. Only a relatively small number of flight attendants were adversely affected by the schedule changes and the total amount of lost flight pay for both the months of July and October was only $1,718.10. In addition, the adverse effect of the mid-month schedule changes lasted only for the duration of the month in which the schedule changes were made because the flight attendants could take into account the schedule changes in bidding on a flight schedule for the following month.
Even if the old collective bargaining agreement was not made in contemplation of mid-month schedule changes, it is clear that the present agreement was made in contemplation of such schedule changes. In a letter dated August 1, 1975, and addressed to counsel for the Flight Attendants, one of the Airline's officers advised the Flight Attendants that the Airline was asserting the right under the agreement to make mid-month schedule changes. Despite the fact that the Flight Attendants were on notice of the Airline's claim that the agreement permitted the Airline to make mid-month schedule changes, the bargaining representatives for the Flight Attendants on August 8, 1975 signed a tentative, new agreement without making any attempt to change the language of the agreement to deal more specifically with the problem of mid-month schedule changes. The Flight Attendants' membership then ratified the tentative agreement on September 19, 1975. It is difficult to see how the Flight Attendants can now argue that mid-month schedule changes were not in the contemplation of the parties at the time of the making of the new agreement.
The Court concludes that the Airline's argument that the problem of midmonth schedule changes is covered by express provisions of the contract is a reasonable one and made in good faith. The Court, therefore, holds that this dispute is arguably covered by the parties' collective bargaining agreement and it is within the exclusive jurisdiction of the System Board of Adjustment to interpret the agreement and determine the ultimate merits of the dispute. This holding is supported by the following *961 cases wherein courts have held analogous disputes to be minor: Rutland Ry. Corp. v. Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962), cert. den., 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963) (unilateral change in home terminals and elimination of some jobs); Hilbert v. Penn. R.R. Co., 290 F.2d 881 (7th Cir. 1961) (unilateral assignment of workers to different terminal); Missouri-Kansas-Texas R.R. Co. v. Brotherhood of Locomotive Engineers, 266 F.2d 335 (5th Cir. 1959) (elimination of the jobs of two of five way-freight crews and changing the home or away-from-home terminals of the remaining crews); Norfolk & Portsmouth Belt Line R.R. Co. v. Brotherhood of R.R. Trainmen, Lodge 514, 248 F.2d 34 (4th Cir. 1957), cert. den., 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958) (unilateral changes in reporting points).
In the alternative, the Court also holds that even if this dispute is not covered by the express provisions of the agreement, it is arguably an "omitted case", concerning a dispute that has arisen incidentally in the course of employment and that merely involves the scope of managerial prerogative impliedly left with the Airline by the collective agreement. It could be reasonably argued that mid-month schedule changes forced upon the Airline by pressing economic considerations is something that occurs incidentally in the course of employment of a flight attendant much like flight cancellations due to weather conditions. In addition, because it is in the Airline's interest, just as much as the Flight Attendants' interest, to avoid unnecessary mid-month schedule changes, so as to maintain a fixed schedule that the traveling public can rely on, it is not unreasonable to infer that the agreement left to the Airline's discretion whether or not to make mid-month schedule changes.
It is important to note that the Flight Attendants have made no bona fide effort to bring about a formal change in the terms of the collective agreement to effect a more specific treatment of the question of mid-month schedule changes. It is true that the Flight Attendants filed a Section Six notice on August 20, 1975, proposing a change in the agreement to meet the problem. The Court of Appeals for the Second Circuit, however, has pointed out that undue emphasis must not be placed on the maneuvers of the parties. Since a Section Six notice is required to initiate a major dispute, the labor representatives are likely to serve such a notice in any dispute arising out of any ambiguous situation so as thereby to make the controversy appear more like a major dispute. Rutland Ry. Corp. v. Brotherhood of Locomotive Eng., 307 F.2d 21, 33 (2d Cir. 1962).
The case sub judice is a classic example of just such a maneuver by the Flight Attendants. Without making any effort to change the agreement to specifically treat with mid-month schedule changes and knowing full well that the Airline claimed the right under the language of the existing agreement to make such schedule changes, the Flight Attendants' bargaining representative signed a tentative, new agreement on August 8, 1975. The Flight Attendants' claimed justification for not attempting to change the agreement with respect to schedule changes prior to August 8, 1975 was that they could not in good faith broaden their initial contract demands.[8] If the Flight Attendants could not in good faith attempt to change the relevant language of the agreement prior to the reaching of a tentative agreement on August 8, it was clearly in bad faith for them to propose a change after a tentative agreement was reached and while a vote on said agreement was pending before the membership of the Flight Attendants. Thus, the Court concludes that the Section Six notice filed on August 20, 1975, the day before this suit was filed, was not a bona fide effort to change the collective agreement, but was merely a maneuver by the Flight Attendants *962 to make this dispute appear more like a major dispute.
Even if the filing of the Section Six notice on August 20 could be construed as a good faith effort to change the agreement, the Court is of the opinion that the subsequent ratification of the tentative agreement on September 19, 1975 waived the notice. The remedy of the Flight Attendants, if they really intended to pursue a change in the agreement with respect to mid-month schedule changes, was to have sought such a change in the negotiations with the Airline over a new agreement as soon as the problem arose in July and to have refused to sign a tentative agreement or ratify a final agreement until the change they proposed was incorporated into the agreement. By signing a tentative agreement and ratifying a final agreement that did not contain the change proposed on August 20, it is clear that the Flight Attendants, as a part of the give and take inherent in the bargaining process, acquiesced in the Airline's refusal to change the agreement to prohibit mid-month schedule changes. Having failed to pursue through the bargaining process their Section Six notice of August 20, the Flight Attendants must be precluded from now using that Section Six notice as a basis for characterizing the present dispute as major.
This dispute, therefore, is arguably an omitted case, having arisen incidentally in the course of employment and involving a situation in which no bona fide effort has been made to bring about a change in the terms of the agreement to specifically cover this difference. Accordingly, on this alternative ground, the dispute is minor and it is for the System Board of Adjustment to determine whether the Airline has exceeded the scope of its residual managerial prerogative. See Illinois Central R.R. Co. v. Brotherhood of Locomotive Firemen & Enginemen, 332 F.2d 850 (7th Cir. 1964), cert. den., 379 U.S. 932, 85 S.Ct. 331, 13 L.Ed.2d 343 (1964) (dispute concerning the furnishing of transportation at the railroad's expense to new tie-up points held to be an omitted case and minor). See also, Brotherhood of Locomotive Firemen and Enginemen v. N.Y., N.H., and H.R.R. Co., 296 F.Supp. 1044, (D.C. Conn.1968) (held that when a party relies on custom or usage rather than on a specific provision in the agreement, the dispute is minor.)
The Flight Attendants rely principally on the Supreme Court's decision in Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,[9] 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), to support its contention that the dispute over mid-month schedule changes is major. Shore Line, however, is inapposite to the issue raised by the instant case. In Shore Line a dispute arose over the right of the railroad to unilaterally establish outlying work assignments away from the traditional reporting point of Toledo, Ohio. After the dispute was taken to a special board of adjustment and the board held that the collective agreement permitted the railroad to unilaterally establish outlying work assignments at the northern end of the railroad's line in Detroit, Michigan, the railroad revived earlier plans to establish *963 outlying work assignments at Trenton, Michigan, an intermediate point between Toledo and Detroit. The union responded by filing a Section Six notice of a proposed change that would forbid the railroad from making any outlying assignments at all. A major dispute was thereby initiated and both parties treated it as such by taking the dispute to the National Mediation Board. The dispute was clearly major because the union was attempting to change the agreement to forbid the railroad from taking action that a special board of adjustment had previously ruled was permitted under the existing agreement. The violation of the Railway Labor Act in Shore Line did not consist of a failure by the carrier to file a Section Six notice of intended change before taking action, as is alleged in the case sub judice, but rather of a failure to maintain the status quo pending the exhaustion of the major disputes procedure which had been put into operation by the union's filing of a Section Six notice. Thus, the Supreme Court considered only the question of defining the status quo provision of Section Six of the R.L.A. In fact, the Supreme Court in Shore Line distinguished an earlier case, Order of Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946), which presented the same issue as the case at bar, on the basis that Pitney dealt only with the major-minor dispute dichotomy and the concomitant question of the necessity of the carrier filing a Section Six notice before reassigning certain jobs. 396 U.S. 142, 157, 90 S.Ct. 294, 303, 24 L.Ed.2d 325, 336.
The Flight Attendants have fallen into the error of failing to distinguish between two types of major disputes. The first type of major dispute involves a situation where the carrier has allegedly violated the Railway Labor Act by unilaterally taking action that is outside the arguable scope of the collective bargaining agreement without first filing a Section Six notice of intended change. It is this type of major dispute that the Flight Attendants have contended was initiated by the Airline in the instant case. The second type of major dispute is initiated by the union filing a Section Six notice proposing to change an agreement to prohibit the carrier from taking action that is admittedly permitted by the existing agreement. In this second type of major dispute it is the union, rather than the carrier, that is seeking to change the agreement. It is this second type of major dispute that was before the Supreme Court in Shore Line, the Supreme Court taking as given the fact that the dispute was major and considering only the problem of defining the status quo.
The Flight Attendants' position could be construed as arguing in the alternative that even if its contention that there is a major dispute of the first type is rejected because the Airline arguably had the right under the agreement to unilaterally put into effect mid-month schedule changes, then its Section Six notice of August 20, 1975 initiated a major dispute of the second type. This argument must be rejected for two reasons.
First, the Fifth Circuit in St. Louis, San Francisco and Texas Railway Co. v. Railroad Yardmasters of America, AFL-CIO, 328 F.2d 749 (5th Cir. 1964) rejected this same line of reasoning. In Railroad Yardmasters the Fifth Circuit reversed the District Court's alternative holdings that the collective agreement did not purport to give the railroad the authority to take the action in dispute and even if the railroad had the full right it claimed under the contract, the union would not be deprived of the right to bargain over the intended action to change working conditions. The fallacy of this type of reasoning is that it gives a union the power to completely circumvent the minor disputes procedure by turning any dispute, no matter how trivial, into a major dispute through the simple expedient of filing a Section Six notice. The Court concludes that the better reasoning is to hold that a Section Six notice filed by a union that proposes to change an agreement to forbid action by the carrier that the union is simultaneously *964 claiming is not even arguably permitted by the agreement is not bona fide and should be given no force or effect.
The Flight Attendants' argument must be rejected for a second reason. The Court has held that the Section Six notice filed by the Flight Attendants on August 20, 1975 was waived by the subsequent ratification of a new agreement on September 19, 1975. Thus, even if the Section Six notice of August 20 initiated a major dispute, that dispute was settled by the ratification on September 19 and is now moot.
Having found that neither the Airline's action in unilaterally putting into effect mid-month schedule changes, nor the filing of a Section Six notice by the Flight Attendants, was sufficient to initiate a major dispute, but that the dispute in this case is minor, the Court concludes that the System Board of Adjustment established by the parties' collective bargaining agreement has primary jurisdiction over the ultimate merits of this dispute. The Flight Attendants must, therefore, be remanded to the System Board for a determination of the right of the Airline under the agreement to unilaterally put into effect mid-month schedule changes and of the entitlement of any flight attendants to a recovery of back pay.
For the foregoing reasons, it is ORDERED that plaintiff's request for interlocutory injunctive relief be, and the same hereby is, DENIED; and, it is further
ORDERED that for the foregoing reasons defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.[10]
Of even date in a separate writing, the foregoing orders are incorporated in a Final Judgment.
NOTES
[1] P. 5 of Blaschke affidavit of November 3, 1975.
[2] Sherrye Reese affidavit of November 19, 1975.
[3] See Exhibit C to Plaintiff's Original Complaint.
[4] P. 4 of Kathy Mills affidavit of November 8, 1975.
[5] Ibid at p. 3.
[6] Sherrye Reese affidavit of November 19, 1975.
[7] Section 3(F) provides as follows:

(F) Cancellations
A regular flight attendant who loses a scheduled trip combination, or portion thereof, due to flight cancellation, during the last four (4) days of the monthly schedule, shall receive flight pay and flight time credit for the trip based on scheduled flight time, or actual flight time flown by the flight attendant, whichever is greater, provided;
1. The trip loss is due to circumstances beyond the flight attendants' control.
2. The trip loss is not caused by a strike or picketing of the Company premises, or by an act of God, (exclusive of cancellations caused by F.A.R. Air Carrier Weather Requirement) or a national war emergency revocation of the carrier's operating certificate, or grounding of the Company's aircraft by Government order.
3. There is not sufficient time free from duty for the flight attendant to recover the lost trip, or portion thereof.
4. There is not sufficient open time which the flight attendant can hold according to her seniority during the last four (4) days of the monthly schedule.
5. The flight attendant requests time from open flying or other flying time available to her.
[8] P. 2 of Katherine Mills affidavit of November 20, 1975.
[9] The only other case cited by plaintiff that might appear to give some substantial support to its position is United Transportation Union, Lodge No. 621 v. Illinois Terminal R.R. Co., 471 F.2d 375 (7th Cir. 1972). In Illinois Terminal the collective agreement was silent as to starting points and did not preclude the railroad from altering the location of work assignments. The 7th Circuit held that an attempt by the railroad to change starting points precipitated a major dispute. Illinois Terminal is distinguishable from the case sub judice on the very basis that the 7th Circuit in Illinois Terminal distinguished earlier cases that had held similar disputes to be minor; i. e., unlike the instant case where a Section Six notice was not filed by the Flight Attendants until the day before this suit was filed, a Section Six notice was filed by the union in the Illinois Terminal case almost 5 months before the railroad attempted to take the disputed action and over five months before the union filed suit. During that 5-month period both parties characterized and negotiated the controversy as a major dispute. 471 F.2d at 379. In the case sub judice only the Flight Attendants have characterized the dispute as major and the Section Six notice filed by the Flight Attendants was later waived.
[10] The Court finds that there is no genuine issue as to any material fact and that Texas International Airlines is entitled to judgment as a matter of law.