JAPAN AIR LINES COMPANY, LTD.,
Plaintiff-Appellee,

v.

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL–CIO ("IAM"), et al.,
Defendants-Appellants.

Nos. 993, 1122, Dockets 75–7060
and 75–7641.

United States Court of Appeals,
Second Circuit.

Argued April 29, 1976.

Decided July 14, 1976.

Murray Gartner, New York City (Poletti Freidin, Prashker Feldman & Gartner, and Edward Brill, New York City, on the brief), for plaintiff-appellee.

Sheldon Engelhard, New York City (Vladeck, Elias, Vladeck & Lewis, Deborah A. Watarz, and Robert Jauvtis, New York City, on the brief), for defendants-appellants.

Before LUMBARD, WATERMAN and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

In this consolidated appeal, the International Association of Mechanics and Aerospace Workers (the Union) seeks review of two orders entered in the Southern District. The first, a temporary restraining order issued by Judge Ward on January 22, 1975 and subsequently extended, prohibited the Union from striking over its demand that Japan Air Lines (JAL) gradually phase out its long standing practice of subcontracting maintenance and ground service work at various of its stations in the United States. The second, a declaratory judgment filed on October 15, 1975, concluded *inter alia* that the Union's above described "scope" proposal did not constitute a mandatory subject about which the parties were required to bargain under the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq. Since the TRO has long since expired, we hold that the appeal therefrom is now moot. Insofar as the Union has appealed from the declaratory judgment, it is affirmed on the merits.

JAL began service to the United States in 1954 with regularly scheduled flights from Tokyo, Honolulu and San Francisco. Although initially it relied on United Air Lines personnel to perform the necessary maintenance and ground service at both locations, within a year JAL had modified this decision and hired the nucleus of its own crew in Honolulu. The development of this core group, grown to fifteen by the time the Union and JAL signed their first agreement effective March 1959, established a precedent which was later repeated as JAL's operations expanded to Anchorage and Los Angeles in 1959 and to New York City in 1966. In each instance, JAL first arranged to have other companies provide its maintenance and ground service; only later, and from time to time, did it replace these independent contractors with its own employees. At present, the Union estimates that it represents approximately 112 JAL employees. JAL places the total at more than 200.

However many employees may be represented by the Union, it is undisputed that since 1958 the Union has been the sole collective bargaining agent for all JAL employees "who comprise the craft or class of Airline Mechanics, including Ground Service and Ramp employees." In that capacity it has negotiated a series of successive agreements with the Company, each of which has contained in substantially similar form the following paragraph:

If, during the life of this Agreement, the Company should establish its own maintenance, ground service or stores facilities at any other base within the United States, its territories and/or possessions, the Company and the Union will meet and negotiate wage rates and other conditions to govern the employees at the new base only prior to, or as near as

possible after, the opening of the new facility.

The genesis of the instant dispute lies in the Union's desire to obtain JAL's affirmative commitment to cease its subcontracting. On September 28, 1973, one month prior to the expiration of the then current agreement, the Union notified JAL of approximately 75 suggested contractual changes, as required by R.L.A. § 6, 45 U.S.C. 156. Most of these dealt with pay scale and working conditions. However, of particular concern here, the Union also proposed that, during the course of the new agreement, JAL assign all its maintenance and ground service work at all its American stations to its own employees.[1]

When negotiations commenced in November 1973, this so-called scope proposal became one of the focal points of discussion. The district court found that despite periodic meetings between labor and management through the next year JAL never wavered from its original position that it would not bargain on the issue of subcontracting.[2] Although the Union raised its scope proposal at each bargaining session, the Company never made any counterproposal.

On January 25, 1974, after three months of fruitless negotiating, JAL requested the assistance of the National Mediation Board in resolving the deadlock between itself and the Union. 45 U.S.C. § 155. The Board accepted jurisdiction of the dispute, which at that point involved matters relating to wages, pension and a no lay-off clause as well as the proposal regarding scope, and it appointed a mediator. Suffice to say that his obviously diligent efforts, extending over a period of nearly four months, proved unavailing. Indeed, with the passage of time, the parties stiffened in their respective postures. Thus, in September 1974 when JAL indicated its willingness to accede to the contract terms which United Air Lines and the Union had already agreed upon, Robert Quick responded on behalf of the Union that the bargaining committee could not recommend ratification unless JAL made some concession on scope. On September 10, the rank and file endorsed Quick's position, rejecting the Company's offer by an overwhelming majority.

Furthermore, on several later occasions throughout the autumn, Quick repeated his insistence that he "had to have something on scope" to satisfy the membership. JAL, however, remained equally adamant and, on November 26, 1974, it addressed a letter to all its workers represented by the Union informing them that it had "told the Union Committee that we will not bargain on 'Scope' or other issues not related to rates of pay or working conditions for our own employees."

On December 17, 1974 the National Mediation Board suggested that the dispute be submitted to arbitration. JAL agreed to arbitrate all issues except scope; the Union rejected the proffer of arbitration in its entirety. As contemplated by the RLA, the Board thereupon informed both the Union and JAL that it was terminating its services as of December 23, 1974 and that following a statutory cooling off period of 30 days, 45 U.S.C. § 155, the parties would be free to resort to self-help.[3]

Anxious to avoid the crippling impact of a strike, JAL petitioned the district court on January 13, 1975 for a permanent injunction barring the Union from continuing to bargain about or engaging in a work stoppage over its scope proposal. In addition, JAL brought on a motion for a prelim-

---

1. The Union's scope proposal provided that, "during the life of this Agreement, the Company shall phase out the contracting of all work covered by this Agreement and employ its own personnel to perform such work."

2. It was apparently not until November 1974 that JAL framed this reluctance in terms of its belief that it was not required by law to negotiate the question of scope.

3. Without reassuming jurisdiction over the case, the Mediation Board subsequently invited the parties to meet, with the assistance of a mediator, beginning on January 14, 1975. Although meetings were held throughout the next two weeks they failed, as had the earlier efforts, to produce an agreement.

inary injunction by an order to show cause, served on the Union on January 14 and returnable two days later.

On January 16, the Union promptly requested that the entire action be transferred to California, pursuant to 28 U.S.C. § 1404, on the ground that the latest round of negotiations had taken place there. After this was denied by the district court, the Union sought a continuance of the scheduled hearing on the preliminary injunction to allow it sufficient time to bring witnesses from the west coast. In an effort to accommodate the Union's logistical difficulties while at the same time protecting JAL's legitimate interests, Judge Ward offered to postpone the hearing if the Union consented to the entry of a TRO until January 31, thus extending in effect the cooling off period which would otherwise end on January 23.

When the Union rejected this compromise plan, the court indicated that it had no choice but to proceed with the evidentiary hearing. Two witnesses then testified for JAL and were cross-examined by counsel for the Union. The Union did not present any witnesses itself but asked leave to submit affidavits in opposition to the preliminary injunction. Judge Ward agreed, setting January 20 as the deadline for all affidavits and any memoranda which the parties might wish to submit.

At 4:30 p. m. on January 22, 1975, pending determination of its motion for a preliminary injunction, JAL returned to the district court, on notice to the Union, and applied for a TRO against the strike threatened to begin that midnight. After yet another unsuccessful attempt to obtain the Union's voluntary agreement to postpone the strike for a period of ten days, Judge Ward issued the requested TRO which enjoined the Union until January 31 from initiating "any form of economic self-help to induce the making of a collective bargaining agreement." In an oral decision, Judge Ward explained that without the TRO, "the case presently before [the district court] would in effect become moot."

As the hearing neared its end, counsel for the Union suggested for the first time that under the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., the maximum duration of a TRO in a labor dispute was limited to five days. Judge Ward thereupon replied that if research disclosed this to be the case, the proper course would be to move within five days to dissolve the TRO. Rather than following this advice, the next day the Union filed in this court both a notice of appeal and a motion to vacate the TRO. On January 28, 1975, a panel of this court denied the motion but ordered the appeal expedited.

Meanwhile, on January 27, in an endeavor to insulate the TRO from appellate critique, JAL petitioned the district court to enter a new order extending the TRO which, by that time, had already lasted for five days. After hearing argument by both sides, Judge Ward concluded that he had the power to extend the TRO even if the Norris-LaGuardia Act applied. Accordingly, he directed that the TRO be continued "whether *ab initio* or by extension up to and including January 31, 1975 at 5:00 p. m."

On January 31, having been unable yet to reach a decision or hold a further hearing on the preliminary injunction, Judge Ward extended the TRO for an additional ten days upon ascertaining that the Union remained firm in its desire to present witnesses. The long postponed evidentiary hearing was finally conducted on February 4, 5, 6 and 7, 1975. At its conclusion, the court further extended the TRO until February 19, 1975, in order to allow adequate time to consider the post-hearing papers which counsel for the Union indicated could not be submitted before February 12.

On February 19, 1975, the district court rendered its opinion on JAL's motion for a preliminary injunction. Although finding that the Union's scope demand infringed upon an area of "managerial decision making or prerogative which is not within the ambit of mandatory bargaining," the court nevertheless held that a preliminary injunction was inappropriate since it was unable

to attribute the impasse which had developed "solely" to the Union's insistence upon bargaining on scope. Three weeks later, JAL and the Union reached final agreement on a new contract, to remain in effect until December 31, 1975. While abandoning for a time the question of scope, the Union made plain its intention to raise the issue anew when negotiations began on the new agreement in November 1975.

Aided by the parties' stipulation that the admissible evidence in the record of the hearing on JAL's motion for a preliminary injunction be treated as the record of the trial on the merits, Fed.R.Civ.P. 65(a)(2), the court entered a final declaratory judgment on October 15, 1975, incorporating its previously announced conclusions with respect to the Union's scope proposal and adding only that the parties might, if they wished, "voluntarily bargain concerning any 'Scope' proposal." The Union's appeal from this judgment was then consolidated with its appeal from the TRO.

I

The Union strongly urges that it was error for Judge Ward to issue a TRO without adhering to the limitations or complying with the procedures mandated by the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. In particular, the Union contends that a TRO issued in the context of a labor dispute may not exceed five days in duration, 29 U.S.C. § 107, and that anything contrary in Rule 65 of the Federal Rules of Civil Procedure must give way to the more specific statutory enactment.[4]

The question of reconciling the facially uncompromising language of the Norris-LaGuardia Act with the seemingly more flexible dictates of later labor legislation is one which has troubled the courts. See e. g. *Boys Markets v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Emery Air Freight Corp. v. Local 295*, 449 F.2d 586 (2d Cir. 1971). Both constitutional constraints and judicial prudence

caution that we refrain from any attempt to resolve this difficult issue when, as here, the challenged TRO has long since expired. *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1030 (2d Cir. 1974).

We find no merit in the Union's assertion that the requisite adversariness is insured by its professed intention of suing on the $50,000 bond filed by JAL as security for the TRO. The facts in *Meyers v. Jay Street Connecting Railroad*, 288 F.2d 356 (2d Cir. 1961), upon which the Union primarily relies to support its claim, distinguish it from the instant case. In *Meyers*, the defendant railroad was appealing from an injunction which prohibited it from abandoning an unprofitable connection until such time as the ICC should give its approval. When the authorization was in fact provided during the course of the litigation, plaintiff maintained that any appeal from the district court's order was moot. We disagreed, stating that,

> [i]f there is a substantial likelihood that the decision of the court will be determinative in some future litigation between the same parties or their privies, the court can be confident that the parties' self-interest will impel them to press every argument at their command and thereby help the court reach the right result and the interest in judicial economy is insignificant since the same issue will in all probability come before the court at a later date. 288 F.2d at 359.

Underlying our holding was the assumption that the obvious expenses incurred by the defendant in the continued operation of the Jay Street Connection made the likelihood of an eventual suit on the bond "overwhelming," Id. See also, *American Bible Society v. Blount*, 446 F.2d 588 (3d Cir. 1971).

▪ Here, by contrast, counsel for the Union, in response to queries from both the district court and this court, has been unable to articulate any compensable harm

---

**4.** Rule 65(b) permits the district court to enter a TRO for ten days, and to extend it for a like period "for good cause shown."

which his client has suffered as a result of the TRO. In light of this failure, the Union's insistence that it intends nonetheless to seek recovery on the bond must be viewed with some skepticism. In any event, it is no substitute for the clear evidence of injury present in *Meyers.* The mere possibility that the Union may later claim damages which it cannot now identify is too slender a thread upon which to justify departure from the well-founded rule that an appeal from a TRO is rendered moot by the dissolution of the underlying order. See *Glen-Arden Commodities,* supra.

## II

■ The Union's appeal from the declaratory judgment is properly before us. While the immediate controversy out of which it arose has been settled, negotiations on the new contract have already begun and the Union has reasserted its demand that JAL terminate its practice of subcontracting its maintenance and ground service work. Thus, neither the challenged policy nor the Union's objection to it have disappeared. Rather, their "continued and brooding presence" throughout recent years has cast a pall upon the collective bargaining relationship of the parties which remains to this day and which seriously imperils the substantial interest of the public in the uninterrupted flow of commerce. See *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). Under these circumstances, "[t]he judiciary must not close the door to the resolution of the important questions" presented, id. at 127, 94 S.Ct. at 1700.

The Union maintains that JAL's unwillingness even to discuss the scope proposal constitutes a breach of its obligation under § 2 First of the RLA, 45 U.S.C. § 152, "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions. . . ." [5] In rejecting this claim the dis-

trict court held that whether JAL chose to persist in its practice of subcontracting was a matter of managerial prerogative about which the Company was free to bargain or not, as it saw fit. The Union insists that in thus engrafting onto the RLA the mandatory-permissive distinction which has long governed the duty to bargain in good faith under the National Labor Relations Act, see *NLRB v. Wooster Division of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), Judge Ward overlooked the critical differences in history, language and design between the two statutory schemes. See *Chicago & North Western Ry. Co. v. United Transportation Union,* 402 U.S. 570, 579, 91 S.Ct. 1731, 29 L.Ed.2d 187 n. 11 (1971). Conceding that a line must be drawn somewhere, the Union suggests that labor and management must meet and confer over any proposal, advanced by either party, which is neither unlawful nor expressly contravened by a provision of the RLA.

We disagree with this expansive interpretation of § 2 First which we believe would impede rather than facilitate the industrial peace which the RLA was intended to promote. See *Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co.,* 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622, reh. denied, 353 U.S. 948, 77 S.Ct. 823, 1 L.Ed.2d 857 (1957). The RLA was enacted in 1926 against a background of nearly forty years of frustration with unsuccessful legislative efforts to stabilize labor relations in the railroad industry. In unique fashion, it was drafted by representatives of the carriers and their employees and then enacted by the Congress. See *International Association of Machinists v. Street,* 367 U.S. 740, 758, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). Testifying on behalf of the bill which they had written at hearings which preceded its passage, spokesmen for both labor and management emphasized that "[t]he only kind of a dispute wherein there is any danger of . . . a strike is a dispute where there is a change

---

**5.** As a carrier by air within the meaning of Section 201 of the RLA, 45 U.S.C. § 181, JAL is subject to all the provisions of the Act.

sought in the existing rules and working conditions." Hearings on Railroad Labor Disputes (H.R. 7180), before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 93 (1926). See also, id. at 113. Accordingly, it was to these areas, and to these areas alone, that they restricted the duty "to exert every reasonable effort to make and maintain agreements," thereby focusing the attention of the negotiators upon what experience had proved to be the most troublesome issues.

■■■ The collective bargaining process is neither a short nor an easy one and the delicate balance upon which ultimate agreement frequently rests would be needlessly jeopardized were the parties at liberty to insist upon the discussion of subsidiary matters. Cf. *NLRB v. Local 445*, 529 F.2d 502, at 504 (2d Cir. 1976). Inevitably, the chance of deadlock increases as the perimeter of the negotiations expands. It was for just this reason that the limiting language, which the Union now urges that we ignore, was included in § 2 First of the RLA. We thus conclude, as has every other court of appeals to consider the question, that the duty to bargain imposed by the RLA extends only to those proposals directly related to "rates of pay, rules, and working conditions." See *International Association of Machinists v. Northeast Airlines*, 473 F.2d 549, 556–7 (1st Cir.), cert. denied, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972); *Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co.*, 128 U.S.App.D.C. 59, 385 F.2d 581, 598, cert. denied, 371 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968); *Puerto Rican Telephone v. NLRB*, 359 F.2d 983, 987 (1st Cir. 1966).

■■■ The primary impact of the scope proposal does not lie in these mandatory areas of bargaining. If adopted, its principal beneficiaries would be those persons hired to fill the newly created jobs. Nothing in the RLA obliges JAL to discuss with the Union issues of immediate concern only to individuals not yet included within the bargaining unit. See *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 179–80, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); *NLRB v. Local 445*, supra.

■■■ The Union's contention that the job security of JAL's present employees is dependent upon the Company's discontinuance of its subcontracting policy is unconvincing. The current collective bargaining agreement already contains a no-furlough clause which, while not absolute, affords substantial protection. Indeed, JAL's recent attempt, stressed by the Union, to lay-off nine workers in Honolulu was aborted when the Union filed a lawsuit. Whatever incidental benefits may nonetheless accrue to Union members from implementation of the scope proposal[6] are outweighed by JAL's proper interest in retaining basic control over the size and direction of its enterprise. See *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233. (Stewart, J., concurring); *International Association of Machinists v. Northeast Airlines*, supra. This is especially so in view of the substantial capital investment which would undoubtedly be required for JAL to purchase and maintain its own facilities and equipment.

■■■ We find no merit in the Union's citation to the majority opinion in *Fibreboard* as support for its claim that any managerial decision concerning subcontracting is *ipso facto* a mandatory subject of collective bargaining. *Fibreboard* held only that an employer must negotiate with the union before "contracting out" work which has always been performed by its own employees. As the district court correctly noted, the instant case presents the converse situation.

Similarly inapposite is the Supreme Court's ruling in *Telegraphers v. Chicago*

---

**6.** JAL employees who are laid off may "bump" into other jobs and stations, displacing workers with less seniority. These opportunities would presumably · increase both qualitatively and quantitatively should JAL agree to the scope proposal. A decision to begin servicing another city in the United States could, however, produce similar results. Yet plainly, this latter choice may be made by management without prior consultation with the Union.

*North Western Ry. Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1964), upholding the right of a union to strike over its demand that the railroad maintain in service certain stations which had fallen into relative disuse. There too, the critical question was whether those who were working were to lose their jobs. Where, as here, that is not the case, the Union's right to insist upon discussion of such peripheral matters, to bargain to impasse, and then to strike upon the exhaustion of mediation efforts is subservient to its paramount and judicially enforceable duty under § 2 First "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." See *Chicago & North Western Ry. Co. v. United Transportation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1967).

The judgment of the district court that JAL need not negotiate with the Union over its continued reliance on subcontracting is accordingly affirmed; the Union's appeal from the TRO is dismissed as moot.