BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff–Appellee,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellant.

No. 85–4138.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1986.

Decided Feb. 11, 1988.

Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, for plaintiff-appellee.

Edward W. Mullen, Deacy & Deacy, Kansas City, Mo., Richard J. Schreiber, Fort Worth, Tex., for defendant-appellant.

Before TANG, PREGERSON, and ALARCON, Circuit Judges.

**ALARCON, Circuit Judge:**

Defendant/appellant Burlington Northern Railroad Company (hereinafter BN) appeals from the district court's grant of a permanent injunction in favor of plaintiff/appellee Brotherhood of Locomotive Engineers (hereinafter BLE). BLE had sought declaratory and injunctive relief to enjoin BN from using dogs (hereinafter sniffer dogs) trained to detect the presence of controlled substances on the person or in the personal effects of railroad employees in violation of the notice, negotiation, and mediation requirements imposed by the Railway Labor Act (hereinafter RLA), 45 U.S.C. §§ 152, Seventh and 156 (1982). The question we must resolve is whether BN's random use of sniffer dogs to detect the presence of controlled substances on the person or in the personal effects of railroad employees presents a "minor" or "major" dispute under the Act, 45 U.S.C. §§ 151–188. This case was consolidated for argument with *Brotherhood of Locomotive Eng'rs v. Burlington N. R.R.* (9th Cir.1986) [838 F.2d 1087] (hereinafter the *Chemical Testing Case*), wherein we reviewed BN's practice of mandatory urine and blood testing practice following an accident or operating rule violation. We affirm because the facts demonstrate that BN's random use of sniffer dogs is not arguably permitted under the parties' implied agreement. Therefore, the dispute

between the parties is major and must be resolved through mediation and negotiation.

## I. FACTS AND PROCEDURAL HISTORY

Following two serious train crashes in April 1984, BN intensified its efforts to enforce Rule G which prohibits the possession or use of alcohol, controlled substances or medications that may adversely affect safety.[1] BN contracted for the services of trained handlers and sniffer dogs to detect the presence of controlled substances on its premises.[2] The sniffer dogs were sent to workplaces throughout BN's extensive railway system. Locations were usually selected because of a high incidence of accidents or safety violations. Occasionally, however, the dog handlers responded to tips of controlled substance usage. The district court found that some locations were chosen randomly.

The dogs were used to inspect vehicles in railroad parking lots, and were taken through yard offices and company buildings. During the random searches, the dogs also sniffed the personal effects of engineers coming on duty.[3] A BN supervisor would randomly request an engineer to place his grip on the ground and to step back while the dog sniffed around the closed container. The dogs were not ordered to sniff the person of the engineer. If the dog "alerted" on the grip, the supervisor would take the engineer to an office and request that the engineer sign a form consenting to a search. BN security staff would then search the grip, the engineer's person, and his vehicle. If the engineer

---

1. Rule G provides:
    The use of alcoholic beverages, intoxicants, narcotics, marijuana, or other controlled substances by employees subject to duty, or their possession or use while on duty or on company property, is prohibited. Employees must not report for duty under the influence of any marijuana or other controlled substances, or medication, including those prescribed by a doctor, that may in any way adversely affect their alertness, coordination, reaction, response or safety.
2. There was evidence that after 1977, BN had occasionally used sniffer dogs to detect con-

trolled substances. A dog handler testified that he had conducted searches using sniffer dogs for controlled substances on BN property on ten occasions prior to 1982. These searches included a search of a crewmember's personal effects. BN records indicate that between May 1984 and October 1984, BN spent over $90,000 on sniffer dogs, including $36,000 for September alone.
3. Engineers and train crews frequently have to spend time away from home as part of their duty. These employees carry their personal belongings in grips.

refused to consent, he was suspended from service pending an investigation for a possible Rule G violation.[4]

BLE opposed the random use of sniffer dogs and urged BN to end the practice. BN refused to discuss the issue.

On October 5, 1984, BLE obtained a preliminary injunction preventing BN from using sniffer dogs. On July 31, 1985, after an evidentiary hearing, the district court granted the Brotherhood a permanent injunction under section 6 of the Act, 45 U.S.C. § 156.

The district court rejected as "specious" BN's claim that deciding the method of detection of safety rule violations falls within BN's managerial prerogative and thus is not a matter for collective bargaining. *Brotherhood of Locomotive Eng'rs v. Burlington N. R.R.*, 620 F.Supp. 163, 169 (D.Mont.1985). The district court noted that the collective bargaining agreements between the parties made no reference to Rule G, nor to any specific method of detecting alcohol or controlled substance abuse, nor to blood and urine tests. The court found, however, that the procedure for the detection and investigation of alcohol or controlled substance abuse adopted by the railroad, and acquiesced in by the union, had existed over a substantial period of time and had become an implied provision or condition of the collective bargaining agreement. *Id.* at 170. The district court also found that the procedure employed by the railroad to implement Rule G consisted of sensory observation by a supervisor of objective symptoms of alcohol or substance abuse, such as slurred speech, staggered walk, alcoholic breath, followed by a voluntary blood or urine test, if the employee wished to clear himself of suspicion. The court held that because the evidence presented at the hearing demonstrat-

ed that the practice of randomly searching the personal effects of employees was never agreed to, or acquiesced in, by BLE, the dispute was major and not "arguably justified" under the terms of the implied agreement extant between the parties. *Id.* at 171–72. The district court enjoined BN from attempting to change the implied agreement between the parties with respect to the detection of violations of Rule G.

## II. STANDARD OF REVIEW

We review the grant of a permanent injunction for an abuse of discretion. *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871. Abuse of discretion occurs if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions. *Sports Form, Inc. v. UPI*, 686 F.2d 750, 752 (9th Cir.1982); *Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1133–34 (9th Cir.1979).

## III. ANALYSIS

BN has presented three discrete and inconsistent theories in support of its contention that the district court abused its discretion in granting a permanent injunction. First, BN claims the use of sniffer dogs is not a proper subject for collective bargaining. Secondly, the railroad contends that use of sniffer dogs has become an implied term of the collective bargaining agreements through past practice. Finally, it is asserted that the use of sniffer dogs was omitted from the collective bargaining agreements and does not create new rights. The record does not support any of these arguments. We analyze each theory under separate headings.

**4.** Documentary evidence submitted to the district court showed that the dog teams operated in 50 locations in 17 states between May 1984 and October 1984 when the district court preliminarily enjoined the program. The dogs checked the personal effects of approximately 1000 train crew, including 250 engineers. The dogs alerted on the grips of 15 engineers; the subsequent searches did not disclose the presence of controlled substances. The dogs alerted on the grips of 61 non-engineer crewmembers; four positive searches ensued: one produced a bottle of alcohol, three uncovered controlled substances. Uncontroverted BN evidence showed a 26% increase in Rule G violation detections in the five months of the program over the first four months of 1984. In the same period, accidents and safety-related rule violations decreased by 52%.

## A. *Managerial Prerogative*

BN contends that since no provision of the collective bargaining agreement between the parties restricts the methods or procedures for detecting violations of Rule G, any procedure it chooses to employ is a matter within BN's managerial prerogative. Therefore, BN reasons, its unilateral implementation of a particular method of detection, such as the use of sniffer dogs, is not a labor dispute under the Act.

This claim lacks merit. As discussed below, because of the existence of an implied agreement regarding the procedures BN may employ in detecting alcohol and substance abuse, BN's choice of methods to detect violations of Rule G is not a matter of managerial prerogative.[5] *Accord, Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R.,* 802 F.2d 1016, 1021, n. 21 (8th Cir.1986) (summarily rejecting BN's management prerogative in a related case).

## B. *The Dog Sniffing Practice Is Not Arguably Justified*

BN contends that even if its decision to use sniffer dogs is not a matter of managerial prerogative, the challenged method of detection is only a minor dispute under the Act because the practice is arguably justified by the parties' implied agreement. We disagree. The parties' implied agreement required a triggering event—the perception of facts that a specific worker had exhibited symptoms of the use of alcohol or a controlled substance—before further investigation could be undertaken. The use of the sniffer dogs was not triggered by an observation that a specific individual was exhibiting objective symptoms of the use of alcohol or a controlled substance. It is quite true that the choice of the *location* of a search was not always random. The district court found, however, that the selection of the *individual* to be searched was random.

Beyond this, under the implied agreement, an investigation was permitted to determine *prior* consumption of alcohol or controlled substances. The district court found that "[t]he practice which evolved over time was one premised upon a determination, through sensory observation, that cause existed to believe a particular employee was *under the influence* of a substance prohibited by Rule G." *Brotherhood of Locomotive Eng'rs,* 620 F.Supp. at 170 (emphasis added). Additionally, the court determined that "[i]f, on the basis of his observations, a supervisor concluded that an on-duty employee was *under the influence* of a prohibited substance, the supervisor would conduct a further investigation and, if necessary, ultimately initiate the appropriate disciplinary procedures." *Id.* (emphasis added). Thus, the implied terms of the collective bargaining agreements did not include a search for the *possession* of alcohol or controlled substances to prevent *future* use. Therefore, the random use of sniffer dogs by BN to detect possession of controlled substances, in the absence of objective facts demonstrating prior use, is not arguably permitted under the implied agreement.

## C. *"Omitted Case"*

BN contends that since there is no specific provision in the collective bargaining agreements limiting the methods of detecting violations of Rule G, the use of dogs to detect the possession of a controlled substance is an "omitted case" under *Ry. Labor Executives Ass'n v. Atchison, T. & S.F. Ry. Co.,* 430 F.2d 994 (9th Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). BN's reliance on *Atchison* is misplaced.

The term "omitted case" first appears in *Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). In defining a minor dispute, the Supreme Court instructed as follows:

> [A minor] dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. *In the*

---

5. We express no opinion as to whether measures such as those imposed by BN in this case could be justified as an exercise of managerial prerogative in the absence of an implied agreement.

*latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries.*

*Id.* at 723, 65 S.Ct. at 1290 (emphasis added); *cf. Airline Flight Attendants in Service of Int'l Texas Airlines, Inc. v. Texas Int'l Airlines,* 411 F.Supp. 954, 959 (S.D. Tex.1976) (the court held that the "dispute is arguably covered by the parties' collective bargaining agreement[,]" *id.* at 960, and in dictum discussed the omitted case theory, *id.* at 961), *aff'd mem.,* 566 F.2d 104 (5th Cir.1978). The Supreme Court has not subsequently applied the term "omitted case."

BN argues that "since the written agreements are admittedly silent, [the dispute] should be considered an omitted case, and thus a minor dispute referrable to the Adjustment Board." Adoption of this bold and novel proposition would eliminate the major dispute resolution procedures of the Act. Under the Act, as interpreted by this court, major disputes involve "efforts to secure new rights" not now part of a collective bargaining agreement. *Int'l Ass'n of Machinists & Aerospace Workers v. Aloha Airlines, Inc.,* 776 F.2d 812, 815 (9th Cir.1985). BN's assertion of the right to use sniffer dogs to search the personal effects of its employees for possession of a controlled substance is not a part of the express or implied terms of the existing collective bargaining agreements. Therefore, the issue presents a major dispute.

In *Atchison,* railway employees brought an action for damages for loss of work resulting from discontinuance of the operation of four interstate trains by the railroad. 430 F.2d at 995. The employees attempted to evade the Railway Labor Act by styling their claim as a tort action for the violation of a statutory duty, and not therefore, a matter within the exclusive jurisdiction of the Adjustment Board. *Id.* at 997. The district court dismissed the action because the challenged conduct raised a minor dispute "properly cognizable by the National Railroad Adjustment Board under provisions of the Railway Labor Act, 45 U.S.C. §§ 151–162." *Id.* at 996. We agreed with the district court and affirmed. *Id.* at 997. We noted that "[i]t is also *undisputed* that this is a 'minor dispute' in the sense that 'the claim is to rights accrued, not merely to have new ones created for the future.'" *Id.* at 996 (quoting *Elgin,* 325 U.S. at 723, 65 S.Ct. at 1290) (emphasis added). Because it was "undisputed" that the dispute was minor, it was not necessary for us to explicate the factual theory supporting this finding. Nevertheless, our opinion contains the following explanatory dictum:

> Here the collective agreements make no specific provision for the payment of wages following discontinuance of a train. However, nothing in the agreements exclude such protection for the affected employees. Whether such a provision was omitted because the parties relied on the language of the Interstate Commerce Act, the 'usage, custom, and practice' of the industry, or whether it was rejected following negotiation does not appear in the record and is a matter requiring the expertise of the Adjustment Board.

*Atchison,* 430 F.2d at 996 (citations omitted). Unlike the procedural posture of the case presented to us in *Atchison,* where we dismissed the action on jurisdictional grounds, this matter is before us after a trial on the merits. Thus, we have a record regarding the "usage, custom, and practice of the industry." We need not speculate as to BN's theory or the factual bases for the district court's holding. BN did not contend before the district court that the use of sniffer dogs to detect possession of a controlled substance was omitted from the collective bargaining agreements because the parties relied on the language of a statute to support the use of sniffer dogs. It cannot do so now for the first time on this appeal. We need not guess whether the parties relied on custom, usage, and practice concerning the procedures followed by BN. The trial court heard evidence on this factual issue and found that there was an implied agreement between the parties based on custom and practice.

*Brotherhood of Locomotive Eng'rs,* 620 F.Supp. at 170. The district court expressly found that the procedures used by BN and acquiesced in by the Brotherhood did *not* include the use of sniffer dogs for the random detection of the possession of a controlled substance. *Id.* at 171–72. The facts support this finding. We review findings of fact following the granting of a permanent injunction under the clearly erroneous standard.

The district court's determination that the implied agreement did not arguably justify the use of sniffer dogs was not clearly erroneous. Furthermore, the fact that there was an implied agreement covering the procedure to be used in detecting Rule G violations demonstrates that this subject matter was not "omitted" from the collective bargaining agreement.

BN also argues that the use of sniffer dogs was not random. This, too, presents a question of fact which was resolved against BN by the district court. The facts, while conflicting, support the court's finding that the searches of the personal effects of individual employees were random. The record contains evidence that the dogs were used to sniff the personal effects of railroad workers notwithstanding the fact that there was no evidence that the specific individual had used or was then in the possession of a prohibited substance. Evidence presented by BN showed that on some occasions the dogs were sent to locations where there had been a high incidence of accidents or safety and operating rule violations. No proof was offered, however, that BN supervisors were aware, *prior to the search,* that each person, whose personal effects were subjected to dog sniffing at such places, had a controlled substance in his possession or was observed to be under the influence of a controlled substance. The district court's finding that the searches were random is not clearly erroneous.

The district court did not abuse its discretion in granting an injunction. The use of sniffer dogs presented a major dispute.

The judgment is AFFIRMED.

PREGERSON, Circuit Judge, concurring.

In this appeal, we are called on to decide whether the Railway Labor Act ("RLA") bars Burlington Northern from unilaterally implementing a sniffer dog program designed to restrict alcohol and narcotics use by on-duty railroad workers. The program requires engineers, before embarking on trains from certain yards, to submit their grips to a trained dog to sniff for the presence of controlled substances. Although I concur in the result arrived at by Judge Alarcon's opinion, I get there by a somewhat different route. First of all, I deal more extensively with the management perogative issued raised by Burlington Northern. Second, I explicitly reject the district court's "modicum of evidence" approach for determining whether the sniffer dog program is arguably justified by the collective agreement's implied sensory surveillance provision. Instead, I base my analysis on the arguable intentions of the parties as manifested by custom and practice. I conclude that the program is not justified. Finally, because Burlington Northern raised the "omitted case" doctrine before the district court, I have sought to clarify the doctrine and show that it is inapplicable to the dog sniff procedure.

## FACTS

For at least 40 years, Burlington Northern ("BN") in common with many other railroads, has had a unilaterally implemented safety rule ("Rule G") prohibiting its employees from using both alcohol and narcotics while on duty and from possessing such substances while on company property. Rule G also bars employees from reporting for duty in a state of intoxication that may in any way impede their ability to perform their work safely.[1] The collective

1. Rule G presently states:
   The use of alcoholic beverages, intoxicants, narcotics, marijuana, or other controlled sub-

stances by employees subject to duty, or their possession or use while on duty or on company property is prohibited. Employees must

bargaining agreements between BN and its employees' unions do not expressly or implicitly refer to Rule G.

Undisputed evidence presented to the district court indicated that, before May 1984, BN relied primarily upon sensory surveillance to enforce Rule G. If an employee's gait, breath, odor, slurred speech, bloodshot eyes, or errant behavior suggested to a supervisor or security officer that the employee was intoxicated, BN suspended the employee pending a formal investigation under established procedures.

On April 15, 1984 a train crash in Wiggins, Colorado killed, five BN employees and caused $2 million in property damage. The National Transportation Safety Board ("NTSB") implicated alcohol abuse by an engineer as a possible cause of the accident. On April 21, a train disobeyed an "absolute stop" signal and crashed into a standing train at Newcastle, Wyoming. Two BN employees died and property damage totaled $1 million. A toxicology report indicated that three crew members had marijuana traces in their body fluids.

Following these two serious crashes, BN intensified its efforts to enforce Rule G by introducing two new programs. First, all crew members involved in an accident or operating rule violation were required immediately to attend a clinic and submit to a urinalysis test for the presence of narcotics. Only crew members involved in accidents or operating rule violations demonstrably due to equipment failure were exempted. Moreover, BN's rules required any employee suspected through sensory surveillance of intoxication to submit to mandatory urinalysis. An employee who refused to submit to mandatory urinalysis was subject to discipline for insubordination.[2]

Second, BN contracted for trained sniffer dogs to detect narcotics on its premises. The dog teams visited work places throughout BN's extensive network. Locations were usually selected by their high incidence of accidents or safety violations, and occasionally the dog teams responded to tips of drug usage. A few locations also were chosen randomly. The dogs checked vehicles in parking lots and were taken through yard offices and company buildings. The dogs also sniffed the "grips" of engineers coming on duty.[3]

In conducting the sniffer dog program, the following procedures were employed. A BN supervisor would request the engineer to place the grip on the ground and to step back while the dog sniffed around the grip. If the dog "alerted" on the grip, the supervisor would take the engineer to an office and request that the engineer sign a form consenting to a search of the grip. BN security staff would then searched the grip, its contents, the engineer's person, and often also the engineer's car, for narcotics. The dogs did not sniff the engineer. If the engineer refused to consent to a search, the supervisor suspended the engineer from service pending an investigation for a possible Rule G violation.[4]

---

not report for duty under the influence of any marijuana, or other controlled substances, or medication, including those prescribed by a doctor, that may in any way adversely affect their alertness, coordination, reaction, response or safety.
BN unilaterally added the reference to "marijuana, or other controlled substances" in 1980.

2. BN's mandatory urinalysis program closely mirrors Federal Railroad Administration ("FRA") regulations that took effect on November 1, 1985. *See* 49 C.F.R. § 219 (1985). The district court upheld the FRA regulations over a fourth amendment challenge, and the appeal, *Railway Labor Executives' Association v. Dole*, No. 85–2891, was argued before us on the same day as this case and another companion case involving BN's mandatory urinalysis program, *Brotherhood of Locomotive Engineers v. Burling-*

*ton Northern Railroad Co.*, No. 85–4137. These cases will be dealt with by separately filed opinions. [839 F.2d 575 (9th Cir.1988) and 838 F.2d 1087 (9th Cir.1988).]

3. Engineers and train crews are frequently required to spend time away from home. On those occasions, these employees carry their personal belongings in grips.

4. The searches were exceptionally thorough, including fanning the engineer's checkbook, taking the credit cards from his wallet, and checking under the carpet of his car. Two engineers testified that their consent to the searches was involuntary because they understood that a refusal to consent would result in a discharge. Neither of the testifying engineers was charged with a Rule G violation.

Documentary evidence shows that the dog teams operated in fifty locations in 17 states

The Brotherhood of Locomotive Engineers ("BLE") strenuously opposed the use of the sniffer dogs and urged BN to end the program. BN refused to negotiate. BLE then balloted its branch chairmen on whether to strike on the sniffer dog issue. A majority of respondents voted in favor of a strike.

The district court granted BLE a preliminary injunction on October 5, 1984 prohibiting BN from using the sniffer dogs. After conducting several evidentiary hearings, the court announced its decision in an opinion filed in July 1985. *See Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 163 (D.Mont.1985). The district court found that "sensory surveillance by certain supervisory personnel" supported by "at least a modicum of evidence" of intoxication had been established by custom and practice as the only method of enforcing Rule G. The district court further found that this custom and practice constituted an implied term of the collective agreement. 620 F.Supp. at 170–71. The court stated that "[t]he critical term of [the collective] agreement ... is the term requiring a modicum of evidence that a particular employee was operating under the influence of a prohibited substance, before a supervisor could conduct further investigation." *Id.* at 175.

The court concluded that random use of sniffer dogs was not "arguably justified" under the collective agreement as amended by custom and practice, and thus BN's use of sniffer dogs, challenged by the unions, constituted a "major dispute" under the RLA requiring the court to enjoin the sniffer dog program. *Id.* at 172. BN appealed this decision which is the subject of the instant appeal.

## STANDARD OF REVIEW

Whether a matter constitutes a mandatory subject of bargaining under the RLA is a question of law which we review *de novo.*

See *Japan Air Lines Co. v. IAM*, 538 F.2d 46, 52–53 (2d Cir.1976); *cf. NLRB v. International Harvester Co.*, 618 F.2d 85, 87 (9th Cir.1980). Whether past conduct constitutes custom and practice sufficient to be incorporated as an implied term in a collective agreement covered by the RLA is a question of fact. *See Missouri Pacific Joint Protective Board, Brotherhood Railway Carmen of the United States and Canada v. Missouri Pacific Railroad Co.*, 730 F.2d 533, 537 (8th Cir.1984); *cf. Hass v. Darigold Dairy Products Co.*, 751 F.2d 1096, 1101 (9th Cir.1985) (implied terms in collective agreement under NLRA). We accept a district court's determination of questions of fact unless clearly erroneous. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Whether a dispute constitutes a major dispute or a minor dispute under the RLA is a matter of law which we review *de novo. IAM v. Aloha Airlines, Inc.*, 776 F.2d 812, 815 (9th Cir.1985).

## ANALYSIS

BN presents alternative arguments in support of its contention that the district court may not enjoin the dog sniff program. BN first contends that the enforcement of Rule G is a matter entirely within its managerial prerogative. Alternatively, BN contends that the challenged procedure presents not a major but a minor dispute, over which the district court lacks jurisdiction, because: (1) the procedure is arguably justified by an implied-in-fact term of the collective agreement; or (2) the procedure is covered by the omitted case doctrine.

### A. *Management Prerogative*

Neither party disputes the fact that Rule G itself is an implied term of the collective agreement. BN asserts, however, that selecting the method used to enforce a safety rule like Rule G is entirely a matter of management prerogative and not subject to

from May 1984 until October 1984 when the district court preliminarily enjoined the program. The dogs checked the grips of approximately 1000 train crew members, including 250 engineers. The dogs alerted on the grips of 15

engineers; *all* of the subsequent searches of those grips *revealed nothing.* The dogs alerted on the grips of 61 non-engineer crewmembers; four positive searches resulted: one produced a bottle of alcohol, and three uncovered narcotics.

collective bargaining. BN argues that, because Rule G enforcement is a matter of managerial prerogative, it is not an issue subject to collective bargaining under the RLA. Thus, any prior enforcement practice cannot be an implied condition of the collective agreement or give rise to a labor dispute within the terms of the RLA.

The district court rejected this position. 620 F.Supp. at 169. I agree with the district court that BN's management prerogative claim is unfounded.

The RLA requires BN "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, *and working conditions.*" 45 U.S.C. § 152 (emphasis added). No court, however, has comprehensively explained the scope of the statutory phrase "working conditions."

In *Japan Air Lines Co. v. IAM,* 538 F.2d 46, 51–53 (2d Cir.1976), the Second Circuit rejected as inconsistent with the legislative history and purpose of the RLA, the union's assertion that the RLA required the parties to bargain over *any lawful proposal* advanced by either side. It held that the RLA mandated bargaining only over "rates of pay, rules, and working conditions." *Id.* at 52. ·Accord *IAM v. Northeast Airlines, Inc.,* 473 F.2d 549, 556–57 (1st Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972); *Brotherhood of Railroad Trainmen v. Akron and Barberton Belt Railroad Co.,* 385 F.2d 581, 599 (D.C. Cir.1967), *cert. denied,* 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968). Therefore, the court upheld the carrier's management prerogative to determine whether to cease subcontracting ground work at certain airports because the "primary impact" of the union's proposal did not affect the working conditions of the union's *present* members. 538 F.2d at 52. In so holding, the Second Circuit contrasted *Japan Air Lines's* situation with that which existed in *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed. 2d 233 (1964), and *Order of Railroad Telegraphers v. Chicago North Western Railway Co.,* 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), in which "the critical question was whether those who were working were to lose their jobs." 538 F.2d at 52–53.

The *Japan Air Lines* approach is simple and pragmatic: if loss of existing employment or employment-related benefits, or potential loss, is the primary impact of the proposal at issue, the RLA requires the parties to bargain over the proposal consistent with the Act's procedures. I would adopt this approach as the rule of this circuit. Here, a Rule G violation, however discovered, could result in an employee's discharge. The critical issue in this case is whether the jobs of present employees are jeopardized by the two enforcement programs. Because jobs of present employees are jeopardized, BN's sniffer dog program is a mandatory subject of bargaining under the RLA and may not be implemented unilaterally.

The district court was, therefore, correct to reject BN's assertion of management prerogative and to reach the question of the nature of the dispute under the RLA.

### B. *Major v. Minor Dispute*

Under the Railroad Labor Act, disputes between railroads and their employees fall into two "sharply distinguished" categories —"major disputes" and "minor disputes." *See Elgin, Joliet & Eastern Railway v. Burley,* 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), *aff'd on rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); *O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d 1141, 1145–46 (9th Cir.1975) (tracing historical development of RLA).[5]

Major disputes arise out of the formation of collective bargaining agreements or unilateral efforts to secure new rights and incorporate them into future agreements. *Elgin,* 325 U.S. at 723, 65 S.Ct. at 1290; *Aloha,* 776 F.2d at 815. Minor disputes involve the interpretation or application of existing collective bargaining agreements.

---

**5.** The terms "major dispute" and "minor dispute" are not found anywhere in the RLA. The Supreme Court in *Elgin* coined the terms as a methodology to be used by courts confronted by disputes arising under the RLA. *See Aloha,* 776 F.2d at 815 n. 2.

*Elgin,* 325 U.S. at 723, 65 S.Ct. at 1290; *Aloha,* 776 F.2d at 815. The distinction between minor and major disputes has important procedural consequences.

Generally, *major* disputes are "left for settlement entirely to the processes of non-compulsory adjustment." *Elgin,* 325 U.S. at 723–24, 65 S.Ct. at 1289–90. A detailed procedure is provided in 45 U.S.C. §§ 152, 155, 156, 157, and 160 for moving the dispute through initial conference and negotiation, submission to the National Mediation Board, voluntary arbitration and, possibly, investigation by a special emergency board appointed by the President. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). "No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." *Elgin,* 325 U.S. at 725, 65 S.Ct. at 1291. Pending the exhaustion of the Act's mechanisms for resolving a major dispute, the status quo applies. The duty to maintain the status quo may be enforced by obtaining injunctive relief in a federal district court. *See Aloha,* 776 F.2d at 816.

In contrast, *minor* disputes are subject to compulsory and binding arbitration. *See* 45 U.S.C. § 153(first)(i). This task is performed by the National Railroad Adjustment Board or a privately established arbitration panel. *See generally* Seidenberg, *Grievance Adjustment in the Railroad Industry* in *The Railway Labor Act at Fifty* 229–35 (National Mediation Board ed., 1976). The arbitrators have exclusive jurisdiction over minor disputes. *See Slocum v. Delaware, Lackawanna & Western Railroad Co.,* 339 U.S. 239, 244–45, 70 S.Ct. 577, 579–80, 94 L.Ed. 795 (1950). Thus, federal courts have no subject matter jurisdiction over minor disputes. *Aloha,* 776 F.2d at 815. When only a minor dispute is involved, there is no duty to maintain the status quo and judicial review of the arbitration panel's decision is extremely limited. *See Union Pacific Railroad v. Sheehan,* 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978) (per curiam).

The test in our circuit for determining if a dispute involves only the interpretation or application of an existing agreement, and is therefore minor, or involves the formation of a collective agreement or a unilateral effort to change working conditions, and is therefore major, derives from *Switchmen's Union of North America v. Southern Pacific Co.,* 398 F.2d 443, 447 (9th Cir.1968). *See Aloha,* 776 F.2d at 815–16; *O'Donnell,* 551 F.2d at 1146–47; *Southern Pacific Transportation Co. v. United Transportation Union,* 491 F.2d 830, 832 (9th Cir.), *cert. denied,* 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974). We have reformulated the test several times. *See Switchmen's,* 398 F.2d at 447 (only if the disputed action is "in nowise contemplated or arguably covered by the agreement" does it give rise to a major dispute); *Southern Pacific Transportation Co.,* 491 F.2d at 832–33 (A dispute is minor when a contract provision is "reasonabl[y] susceptible" to a party's interpretation); *O'Donnell,* 551 F.2d at 1146 ("Is the position of at least one of the parties *arguably* predicated on the terms of an agreement?"); *Aloha,* 776 F.2d at 816 (major dispute concerns issue "neither contemplated nor arguably covered" by collective agreement).

The district court accurately summarized the essence of these various reformulations as *whether the railroad's actions are "arguably justified"* by the collective agreement between BN and the BLE. *See* 620 F.Supp. at 175. If the railroad's actions *are* arguably justified, the dispute is a *minor* dispute; if they are *not* arguably justified, the dispute is a *major* dispute. When in doubt, courts construe disputes as minor. *See O'Donnell,* 551 F.2d at 1146–47 (*Switchmen*'s test "is not a stringent one"); *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.,* 768 F.2d 914, 920 (7th Cir. 1985) (citing cases).

1. *Sensory Surveillance as Implied–In-Fact Condition to the Collective Agreement*

In *Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24

L.Ed.2d 325 (1969) (*Shore Line*), the Supreme Court held that the scope of the status quo in a major labor dispute includes "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute."

Although *Shore Line* concerned a dispute that all sides agreed was a major dispute, its teaching applies to *all* railroad labor disputes—major or minor. The Supreme Court's holding that the status quo in a major dispute includes employment terms established by past practice means that a railroad collective agreement includes *both* express terms and terms implied by past practice. *See Maine Central Railroad Co. v. United Transportation Union*, 787 F.2d 780, 782–83 (1st Cir.) (railroad's assertion that proposed action comported with past custom and practice was arguably correct and thus dispute was minor), *cert. denied*, —— U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986).

Relying on *Shore Line*, the district court concluded that both Rule G and its customary enforcement by sensory surveillance were implied terms of the collective agreement between BN and BLE. 620 F.Supp. at 170. The district court found that sensory surveillance by BN's supervisors had been the only regular method of Rule G enforcement for over forty years and that BLE had long acquiesced in this practice. There is ample evidence in the record to support this conclusion. Several BLE officials with long experience regarding BN's operating procedures so testified. Moreover, BN never disputed that sensory surveillance by BN's supervisors was the primary means of detecting Rule G violations before 1984.

The district court also found that BN's occasional use of sniffer dogs before 1984 did not rise to the level of custom and practice. This conclusion is also supported by the record. *See* note 4 *supra.*

Because Rule G enforcement is a mandatory subject of bargaining, and because the district court did not clearly err in finding that sensory surveillance was the customary means of detecting Rule G violations, I would uphold the court's conclusion that Rule G enforcement by sensory surveillance was an implied condition of the collective agreement.

The district court further determined that the custom and practice of relying on sensory surveillance by BN's supervisors to detect Rule G violations arguably justifies any reasonable enforcement method based on "a modicum of evidence." 620 F.Supp. at 171. In the instant case, the court concluded that such an implied condition did not arguably justify BN's dog sniff program because engineers subjected to dog sniffs were selected at random, i.e., their selection to determine whether they had violated Rule G was not based on a "modicum of evidence." *Id.* at 171–72.

In my view, the district court's "modicum of evidence" rationale begs the question. The critical inquiry should not be whether an enforcement procedure is triggered by sufficient objective facts, but whether the parties to this labor dispute, by their conduct, can be said to have agreed to the challenged enforcement procedure. It seems to me farfetched to conclude that the BLE, by acquiescing in Rule G's enforcement by sensory surveillance of an employee's gait, breath, odor, slurred speech, or blood shot eyes, can be said to have agreed to allow BN to implement *any* procedure beyond sensory surveillance so long as the procedure is triggered by a "modicum of evidence."

The kind of sensory surveillance that BN's supervisors had employed in the past did not implicate the serious privacy intrusions posed by BN's use of sniffer dogs. I believe that it is incorrect to conclude that the union impliedly agreed to the current use of sniffer dogs just because "through custom and practice" it had for forty years accepted enforcement of Rule G by the non-intrusive procedure of sensory surveillance. Moreover, such sensory surveillance as employed by BN's supervisors entailed individualized suspicion whereas the use of sniffer dogs rests on group suspicion. The use of sniffer dogs is, in my view, a clear change in working conditions

governed by the collective agreement and, thus, by definition, a major dispute.

It may well be that the use of sniffer dogs is an appropriate response to BN's safety obligations. However, the merits of the procedure are not before us. I would, therefore, conclude that BN's use of sniffer dogs is not *arguably* justified by the implied provision in the collective agreement that BN may enforce Rule G by sensory surveillance.

### 2. *The Omitted Case Doctrine*

The Supreme Court first referred to the "omitted case" doctrine in *Elgin, Joliet & Eastern Railway v. Burley*, 325 U.S. at 723, 65 S.Ct. at 1290. An omitted case refers to a "claim founded upon some incident of the employment relation, or asserted one, *independent of those covered by the collective agreement*, e.g., claims on account of personal injuries." *Id.* (emphasis added). If an omitted case is involved, the dispute may be characterized as a minor dispute if it is arguably justified by an implied-in-law provision in the collective agreement.

In rejecting BN's omitted case argument, the district court noted that an omitted case arises only in a minor dispute, and concluded that, because BN's use of dog sniffs was a major dispute, it could not be an omitted case. 620 F.Supp. at 172. This application of the omitted case doctrine is inappropriate because it assumes the result.

As is true of all agreements, a collective bargaining agreement may include terms which, although omitted from the text of the agreement, are nonetheless part of the agreement because they are implied-in-law. Thus, it is necessary to determine whether the sniffer dog program, which is not covered by an express or implied-in-fact provision, is nonetheless arguably justified by an implied-in-law condition.[6]

The obligations of the Railroad Safety Act of 1970, as amended, 45 U.S.C. § 431 et seq., and the 230 detailed pages of federal regulations pursuant to the Act, 49 C.F.R. §§ 209.1–236.838 (1985), are implied-in-law conditions of the collective agreement between BN and the BLE. Similarly, the provisions of several earlier acts dealing with railroad safety and their enforcing regulations are all implied-in-law omitted conditions of the collective agreement.

---

**6.** We first considered the omitted case doctrine in *Railway Labor Executives' Association v. Atchison, Topeka and Santa Fe Railway Co.*, 430 F.2d 994 (9th Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). There Santa Fe obtained the ICC's approval to discontinue rail service on a certain line. The railroad, however, discontinued the service early, and the union sued for the prematurely displaced workers' lost wages. We held that the dispute was minor because it involved an interpretation of an omitted provision of the collective agreement.

We concluded that the collective agreement contained

no specific provision for the payment of wages following discontinuance of a train. However, nothing in the agreements exclude such protection for the affected employees. Whether such a provision was omitted because the parties relied on the language of the Interstate Commerce Act, the "usage, custom, and practice" of the industry, or whether it was rejected following negotiation does not appear in the record and is a matter requiring the expertise of the Adjustment Board.

*Id.* at 996 (emphasis added).

Despite the broad language in *Atchison,* the omitted case doctrine should only apply to im-

plied-in-law conditions (statutory obligations) and not to implied-in-fact conditions (custom and practice) or conditions deliberately omitted from the collective agreement during earlier negotiations. In *Elgin,* the Supreme Court described an omitted case as a "claim founded upon some incident of the employment relation, or asserted one, *independent of those covered by the collective agreement,* e.g., claims on account of personal injuries." 325 U.S. at 728, 65 S.Ct. at 1292 (emphasis added). The Court's example in *Elgin* must refer to a railroad's statutory obligation to pay workers' compensation to injured employees under the Federal Employers' Liability Act. Therefore, the scope of the omitted case doctrine is narrower than a superficial reading of *Atchison* might suggest.

In addition, BN contends that *Atchison* holds that the omitted case doctrine applies *whenever* the dispute is over a matter not prohibited or sanctioned by a collective agreement. A narrower reading of *Atchison* is more consistent with the RLA. A holding that any dispute over a matter neither prohibited nor sanctioned by a collective agreement is a minor dispute would reduce the number of major disputes to a small handful and would largely vitiate the major dispute resolution procedures of the Act.

*See, e.g.,* 45 U.S.C. §§ 1–43 (safety appliances and equipment on railroad cars and rail lines); and 45 U.S.C. §§ 61–66 (limitations on hours of service railroad employees).

Federal Railway Administration regulations specifically prohibit any BN employee from using or possessing any controlled substance on railroad property, 49 C.F.R. § 219.101(a)(1). But, there are no statutes or regulations that authorize or require the railroad to use sniffer dogs to detect employees who use or possess drugs while at work. In short, there is total legislative and administrative silence on this subject. Thus, there is simply no implied-in-law condition that could arguably justify BN's sniffer dog program, and the challenged program, which is outside the ambit of the collective agreement, is a major dispute.

## CONCLUSION

The permissible breadth of the measures that an employer may take to ensure that abuse of controlled substances does not impair an employee's work performance is a relatively novel and controversial issue. In this case, resolution of the issue is made more difficult by the intricacies of the Railway Labor Act, the silence of the express terms of the collective agreement on such matters, and a recognition of the havoc that an intoxicated railroad employee can wreak.

BN's use of sniffer dogs to enforce Rule G concerns "working conditions" and its primary impact may affect the job security of BN's employees. Therefore, the district court correctly concluded that the program is a mandatory subject of bargaining.

The district court also correctly concluded that the collective agreement included an implied-in-fact provision based on custom and practice that permitted BN to enforce Rule G through sensory surveillance. Moreover, I agree with the district court, but for different reasons, that this implied provision does not arguably justify a sniffer dog enforcement program. Finally, the Railroad Safety Act and the regulations promulgated thereunder offer no support for the proposition that the sniffer dog

program is arguably justified as an implied-in-law condition under the omitted case doctrine. Accordingly, the district court correctly held that the union's objections to the sniffer dog program presented a major dispute under the RLA. Thus, I vote to affirm the district court's issuance of an injunction enjoining the program.